SUMMERS, Justice.
The issue here is whether the lessee in a lease and option to purchase agreement affecting real estate has complied with the terms and conditions of the option to purchase.
Newt V. Mills, as lessor, and Jerry Adams, as lessee, entered into a written agreement denominated as a “rent contract” on October 20, 1971. By the terms of the agreement Mills let and rented 160 acres of land in Jackson Parish for a term of five years beginning November 1, 1971 and ending at midnight October 31, 1976 for a rental of $200 per month. The agreement further stipulated in detail additional rights and obligations of the parties during the terms of the lease.
Thereafter, in a clause of this agreement, Mills as owner agreed to sell the lands involved to Adams on November 1,1976 for $450 per acre, a total of $72,000 cash. In consideration thereof Adams agreed to purchase under those terms and conditions or lease the property for an additional five years under the conditions set forth in the lease provisions of the agreement, the lease extension to begin November 1, 1971 and end October 31, 1976.
As it will appear later, the agreement significantly provided: “All notices hereunder shall be in writing and may be given in person or may be given by United States Registered Mail, addressed as follows, which addresses may be changed by-like notice to-wit: Newt V. Mills, 715 Loop Road, Monroe, Louisiana 71201.”
Alleging that Adams did not tender the purchase price of $72,000 on November 1, 1976 or pay the rentals due after November 1, 1976 or for six months thereafter, Mills instituted this rule to show cause on May 4, 1977 to have the option to purchase declared void and without effect for failure of Adams to timely exercise the option set forth in the agreement and to have the lease declared “ended” and the premises returned to Mills.
After filing an exception to the summary proceeding, Adams averred in his answer that he had attempted to exercise the option to buy by notice to Mills personally and by “notice of tender of the $72,000.00 by certified mail” through the attorney representing Adams. He alleged further that he continues to tender the agreed amount and remained on the premises pursuant to the exercise of the option, having instituted a separate suit for specific performance.
The trial judge found that “defendant has substantially complied with the agreement and attempted to exercise the option.” The rule was therefore recalled and the petition dismissed at plaintiff’s cost. On appeal to the Second Circuit, the judgment was affirmed, the court finding that the trial court “was faced with credibility issues which were resolved against Mills.” Certio-rari was granted on plaintiff’s application, 359 So.2d 1309.
A study of this record confirms the fact that there is categorical disagreement in the testimony of Mills and Adams on crucial issues relating to the exercise of the option to purchase. This disagreement can only be resolved by a credibility determination, a matter which the trial judge is particularly qualified to resolve. There is, however, other testimony and there are other facts which resolve the factual issue in favor of Adams and the judgments under review are affirmed.
In October 1971 when Adams was considering entering into the agreement of lease and option to purchase with Mills, he consulted George Moore, who was then an official of the Ouachita National Bank in Monroe. Moore testified that at that time Adams obtained Moore’s opinion concerning the contract he was about to sign with Mills and whether the bank would lend him the money, until he could get long term financing, if he decided to buy the property in the future. After consultation with another official they gave Adams a verbal commitment to lend him $72,000 to buy the property should he decide to do so in keeping with the contract. With this assurance Adams signed the agreement with Mills, took possession of the property and actively engaged in the cattle business.
*1327 During the latter part of 1976, after Moore was transferred to the First National Bank of West Monroe, Adams again consulted him, inquiring whether Moore would confirm the commitment in his capacity as Executive Vice-President of the West Monroe bank. Moore reassured Adams at that time and reaffirmed the commitment to lend Adams $72,000 to buy the Mills property, this time on behalf of the West Monroe bank.
Having been reassured that the money would be available to purchase the property, in August 1976 Adams contacted Mills and informed him that he had a commitment for $72,000 from the First National Bank of West Monroe to purchase the property. On that occasion he stated to Mills that at the appropriate time when Mills produced the deed he would deliver a cashier’s check in full payment. Subsequently, each time he met Mills he restated his willingness and ability to purchase the property-
In the early part of October 1976 when the last rental payment of the five year term became due, Adams prepared a statement addressed to Mills which he delivered to Mills along with the rental check due for that month. The statement, dated September 15, 1976 read:
“Mr. Newt Mills—
This is to confirm the intent of the undersigned to exercise the option specified in the lease contract entered into and signed and recorded between Jerry A. Adams and Newt V. Mills to purchase said property consisting of 160 acres, more or less, known as the McClendon Place and located in Jackson Parish for the specified price of $450.00 per acre, a total of $72,000.00 cash. Payment is to be a cashier’s check drawn on First National Bank of Monroe & West Monroe. Payment to be made on October 15, 1976 upon transfer of deed to described property and not later than 9:00 a. m. on October 29, 1976.
Jerry A. Adams”
Not having received a response from Mills, Adams went to Mills’ residence and again repeated that he had a commitment for the money to purchase the property and that he wanted to exercise the option. According to Adams, Mills declared at that time that he couldn’t sell the property because the tax he would be compelled to pay on the transaction would exceed $30,000. Adams then said he intended to exercise the option if there was a legal means to do so. In another effort to persuade Mills to comply with the agreement, Adams returned to Mills’ residence on October 17, 1976, saw Mills inside, knocked on the door but Mills did not answer. Adams then telephoned from a nearby phone and received no answer.
At this point, Adams consulted Benjamin M. Peters, Esquire, attorney of Monroe, requesting that Peters notify Mills by certified mail of his intention to exercise the option prior to the November 1, 1976 deadline, and that Peters arrange for the necessary title opinion required by the bank in connection with the contemplated loan. Peters testified that he checked with George Moore at the bank, ascertained that the bank was committed to lend Adams $72,000 and that the bank would accept a title opinion by Peters in connection with the loan.
Peters then mailed a letter to Mills by certified mail, requesting a return receipt. The letter, on counsel’s letterhead, dated October 27, J.976, reads as follows:
“October 27, 1976
CERTIFIED MAIL
No.: 694380
■Mr. Newt V. Mills
715 Loop Road
Monroe, Louisiana 71201
Re: (1) Jerry A. Adams
(2) Conveyance of McClendon Place consisting of 160 acres, more or less, in Jackson Parish in accordance with lease and option to purchase
(3) Mr. Adams’ letter of September 15, 1976, exercising option in Reference (2)
*1328 Dear Mr. Mills:
Mr. Jerry A. Adams has retained me to review the title on the above referenced property and to review the deed which is generally prepared by the vendor, yourself, in real estate closings of this type. Accordingly, I would appreciate your providing me with a copy of the proposed Cash Deed at your earliest convenience. Mr. Adams has obtained a financial commitment and is still willing to pay the consideration of $72,000.00 cash, by not later than October 29,1976, in accordance with Reference (2) and (3) above.
Mr. Adams has become concerned with your refusal to communicate with him; and accordingly, this letter also constitutes further notice of his intent to exercise the option contained in Reference (2) above. Your failure to reply to this letter in seven days will indicate your refusal, and the appropriate legal action will be commenced accordingly. Please provide this writer with a copy of the proposed deed or communicate your willingness by telephone immediately.
With kindest personal regards
Yours very truly
(Signed)
Benjamin M. Peters”
When Peters received no answer he instructed his secretary to inquire of the post office the cause for the delay. He was then advised by the post office that delivery had been attempted on October 28, J976 but the certified letter was unclaimed. The post office was instructed to return his letter to Mills.
Thinking that perhaps Mills was out of town when delivery of the certified letter was attempted on October 28, 1976, on November 22, 1976 Peters again addressed a letter to Mills, this time by ordinary mail, forwarding a copy of the letter of October 27, 1976 and the return receipt of the post office showing the letter had been unclaimed. Peters requested that Mills advise him of his “disposition in this matter immediately.” The next day Mills telephoned Peters. Peters told him that Adams was ready to close the sale and would tender the $72,000. Mills replied that he had received no such notice and for that reason the agreement to sell expired on November 1, 1976. Mills stated further that Adams had caused some damage to the property and was indebted to him because of this.
In a further attempt to persuade Mills to agree to sell the property, Adams returned to Mills’ house to find out what damage had been caused and what he owed Mills, stating that if he owed something he intended to pay it; whereupon, Adams testified, Mills became hostile, asserting that he couldn’t sell the property. But, Mills offered to return the $12,000 Adams had paid in rentals during the five-year term of the lease, saying he realized Adams had suffered tough luck in the cattle business. Adams rejected this offer and restated his determination to buy the property in accordance with their written agreement.
On April 15, 1977 Mills served a written notice on Adams to surrender possession of the property prior to April 30, 1977. When Adams refused, this suit followed.
While Mills denies that he ever refused to sell the property to Adams prior to November 1, 1976, his position seems to be that Adams made no real tender of the purchase price and this failure had the effect of rendering the agreement to sell null and void after November 1, 1976.
This Court is of the opinion that the record of this case, and the decision of the trial judge and the Court of Appeal sustain Adams on this factual issue.
Peters, an experienced attorney practicing for eleven years, principally in the field of real estate, oil and gas and corporate matters, had closed approximately 800 such loans. In addition, he was a director and stockholder of Ouachita National Bank in Monroe, serving on the Discount and Trust Committee. He testified it was the custom and practice in transactions such as this one for the seller to prepare the deed and deliver it to the purchaser for approval. If approved, the purchaser is then obligated to pay the purchase price at the signing.
It is apparent from this record that Adams, who did not consult an attorney *1329 until later, understood that Mills was required to submit the deed to him before he was expected under the prevailing practice and custom to pay the purchase price. It would seem also that such a practice is compatible with Mills’ obligation to sell. Everhardt v. Sighinolfi, 232 La. 996, 95 So.2d 632 (1957); Fortenberry v. Decay, 279 So.2d 725 (La.App.1973). Adams’ efforts, therefore, were directed to having Mills take that first step in the transaction- — presentation of the deed. For this reason he repeatedly advised Mills of his intention to exercise the option, stating that he had a commitment for the money and would tender a cashier’s cheek for the purchase price upon delivery of the deed. Mills, too, was undoubtedly aware of this practice and his failure to present the deed had the effect of frustrating Adams’ efforts to complete the sale transaction timely.
The procedure followed was later confirmed as the proper approach by Adams’ lawyer. He too requested delivery of the deed from Mills as a first step toward completing the sale. It was incumbent upon Adams, under principles of fair dealing, which should always prevail in matters of contract, to inform Mills of his intention, in order that Mills might not be taken by surprise at the last minute and fail in his obligation to proffer the deed in time. Anse La Butte Oil & Mineral Co. v. Babb, 122 La. 415, 47 So. 754 (1908).
The contention of Mills that Adams cannot succeed here because he has not tendered the purchase price assumes that such a tender was necessary, when, as a matter of fact, it was not. Adams offered to perform and when he did so it was incumbent upon Mills to proffer the deed before Adams could be called upon to pay the price. Cf. La. Civil Code art. 2462.
When Peters mailed the certified letter to Mills on October 27, 1977, addressed to Mills at his residence as stipulated in the contract, it was incumbent upon Mills to receive and claim the letter. According to the notations on the envelope an attempt was made to deliver the letter on October 28,1976. It would avail nothing to stipulate that notices are to be mailed to a certain address if the party to be notified fails to claim the mail.
For the reasons assigned, the judgment of the Court of Appeal is affirmed.
MARCUS, J., dissents and assigns reasons.
DENNIS, J., dissents and assigns reasons.
SANDERS, C. J., dissents for reasons assigned by DENNIS, J.